Filed 3/26/26  In re E.G. CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re E.G., a Person Coming Under the Juvenile Court Law. | D086740 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. EJ04460B) |
| Plaintiff and Respondent, | |
| v. | |
| E.G., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Alejandro Morales, Judge.  Affirmed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant.

David J. Smith, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

E.G. (Father) appeals the juvenile court's orders terminating his parental rights to his child, E.G. (Child). (Welf. & Inst. Code,[1] § 366.26.) Father contends the juvenile court erred in finding that the beneficial parent-child relationship exception to adoption did not apply because he has maintained consistent visitation, had a beneficial relationship with Child, and there was substantial emotional attachment between Father and Child. (*Id.*, subd. (c)(1)(B)(i).) Father also contends the San Diego County Health and Human Services Agency (Agency) failed to comply with inquiry requirements of the Indian Child Welfare Act of 1978 (ICWA), 25 United States Code section 1901 et seq., and Welfare and Institutions Code section 224 et seq. He contends the Agency did not fulfill its duty of inquiry as to paternal relatives and requests conditional reversal and remand for compliance with ICWA. We disagree and affirm the orders terminating parental rights. We also decline to order a conditional remand for further ICWA inquiry.

FACTUAL AND PROCEDURAL BACKGROUND

On November 29, 2023, the Agency filed the initial petition alleging a section 300, subdivision (b) violation. The Agency filed the petition after Mother and Child tested positive for fentanyl, amphetamines, and methamphetamines at Child's birth. The petition further alleged that Father knew of Mother's drug use during pregnancy and was unable to stop her. In the attached ICWA-010(A) form, an Agency social worker stated she asked Mother and Father about Child's Native American status. The social worker determined that nothing Mother and Father said gave her reason to believe Child was, or may be, a Native American child. In its detention report, the

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

Agency stated that Mother and Father denied any Native American ancestry. Mother and Father also stated neither they, nor any family members, had ever lived on a reservation or were enrolled members in a tribe. The detention report also stated that two maternal aunts denied Native American ancestry. The Agency also stated that in the previous dependency case of Child's older half-sibling, the juvenile court found in 2019 that ICWA did not apply.

At the initial hearing, Mother and Father denied Native American ancestry. The Agency also stated that the maternal grandmother denied Native American heritage. The court instructed the parents to complete the ICWA-020 form and deferred a finding on ICWA.

Child remained in the NICU for approximately two and a half months due to his symptoms of withdrawal and underwent a procedure to insert a feeding tube. While in the NICU, Mother and Father visited Child every few days, often late at night.

In the disposition report, the Agency stated that Mother and Father again denied any Native American ancestry. The Agency mailed the paternal grandparents and paternal aunt documents inquiring about any Indian heritage. Using the phone numbers listed on the relative search, the Agency attempted to call the paternal grandparents and the paternal aunt to inquire about ICWA. However, the numbers had all been disconnected. Additionally, Father twice declined to provide contact information for either the paternal grandparents or paternal aunt so the Agency could assess them as potential placements for Child. When the Agency was finally able to reach the paternal grandmother, she denied any Native American ancestry or that she or any family members had ever lived on a reservation or were enrolled members in a tribe. The paternal grandmother declined to provide the

Agency with contact information for other family members, stating she "can vouch" there is no Native American ancestry in the family.

Upon the child's discharge from the hospital, he was placed in a foster home. The foster mother received training from the hospital on how to care for the child's complex medical needs.

In February 2024, the juvenile court sustained the petition, ordered Child detained, and reunification for Father with supervised visitation for both parents. The court also found that ICWA did not apply. The Agency did not recommend reunification services for Mother pursuant to section 361.5, subdivision (b)(10) and (11). Mother and Father had supervised visitation with Child for one hour, twice per week.

In April 2024, Father enrolled in a methadone clinic. In May 2024, Father entered a residential substance use treatment center. He also completed parenting sessions. While receiving treatment, Father had supervised visits with Child twice a week at the treatment center. Father "cared for [Child], changed his diaper, held him when he cried, and played with him."

At the six-month review hearing, the court ordered unsupervised visits for Father upon clearance by the public health nurse. The court asked the paternal grandmother whether she had any Indian ancestry, and she responded in the negative. The nurse observed Father handling Child's feeding tube sessions "without any hitches."

The following month, Father was discharged from his residential treatment program due to "a couple of relapses in the last week." Father tested positive for methamphetamine on August 26, 2024 and admitted to using methamphetamine on September 4, 2024. Father agreed to return to supervised visits with Child until he enrolled in a new program and tested

4

negative.  On September 23, Father enrolled in an outpatient treatment program and resided at a sober living facility.  Father identified as triggers for using drugs both "being comfortable" and "the pressure of being the only parent that can reunify with the baby."

On October 28, Father returned to unsupervised visitation with Child and agreed to contact the caregiver if he had any concerns or needed support during the visit.  On November 4, Father's counselor reported that Father tested positive for fentanyl.  Father declined to discuss the test result with the social worker, said "it was dirty" but that "it should not have been positive."  Father reverted to supervised visitation twice a week for two hours each time.  In its November report, the Agency reported Father "regularly attends visitation with the child and arrives on time, presents well, and acts appropriately with the child" and "is able to successfully hook up and disconnect the child's [feeding tube]."

On November 14, Father tested positive for methamphetamine and fentanyl and admitted he had been using drugs since October.  Due to his lack of participation in treatment, he was no longer allowed to reside in the sober living home.

At the December modification hearing, the court ordered supervised visits for Father and ordered him into dependency drug court.

On January 14, 2025, Father tested positive for methamphetamine and fentanyl.  At the twelve-month review hearing, the Agency recommended termination of Father's reunification services due to his lack of progress.  The court granted the Agency's section 388 petition, reverted Father's visits to supervised, and set the matter for trial.  Later that month, the dependency drug court informed the Agency that Father had "followed through with

5

everything that he is being asked to do" and was waiting on an opening at a detox facility. Father continued to have supervised visits with Child.

In February, Father entered a detox facility and dependency drug court reported he was in "good compliance." While in detox, Father could not leave the facility or attend Child's doctor's appointments. Father's counselor reported that he was "doing very well." Father's supervised visits with Child resumed on February 24.

At the contested 12-month review hearing in March, the Agency renewed its recommendation to terminate reunification services for Father due to his inability "to stay free from illegal drugs." Father identified his sober date as February 4, 2025—the day he entered detox. Father testified about his treatment plan and efforts to maintain his sobriety. Father asked the court to continue his reunification services to the 18-month mark. Child's attorney agreed with the Agency's recommendation to terminate services for Father, stating Father's effort was "just a little too late." The court adopted the Agency's recommendation, terminated services for Father, and scheduled a section 366.26 hearing.

At the section 366.26 hearing in August, the Agency and minor's counsel asked the court to find Child was generally and specifically adoptable. The court then considered whether Father met the parental bond statutory exception to terminating his parental rights. (See § 366.26, subd. (c)(1)(B)(i).) This is a three-part analysis. All parties agreed Father met the first prong of the section 366.26, subdivision (c)(1)(B)(i) exception by maintaining regular and consistent visitation. However, the Agency and minor's counsel argued Father did not establish the second and third prongs because Child has never lived with Father, did not form a substantial relationship with Father, and any detriment from terminating parental

rights would be outweighed by the benefits of a "safe, stable, adoptive home." Father argued he met all three prongs of the exception and asked the court to find that the parent-child bond exception applied and to order a less permanent plan such as guardianship.

The court found, by clear and convincing evidence, that Child was generally and specifically adoptable. The court also found that Father maintained regular visitation and contact with Child under the first prong of the parent-child bond exception. As to the second prong, the court explained that given Child's young age and the fact that he had been in foster care since birth, Child had not formed a substantial positive emotional attachment with Father. As to the third prong, the court explained it must weigh the detriment of severing the relationship against the benefits of adoption. The court considered that reunification services were terminated because of Father's inability to maintain sobriety and concluded that the stability and benefits of adoption outweighed any detriment in severing their relationship. Finding that no exceptions applied, the court terminated the parental rights of Mother and Father as to Child. The court found, without prejudice, that ICWA did not apply to Child's case, stating "there is no information to the contrary." Father timely appealed.[2]

DISCUSSION

A. *The Juvenile Court Did Not Err in Terminating Father's Parental Rights*

Father contends the juvenile court erred in finding the beneficial parent-child relationship exception did not apply. We disagree. Substantial evidence supports the court's finding that Child did not have a significant, positive emotional attachment to Father and the benefits of adoption outweighed the loss of the parent-child relationship.

---

[2] Mother is not a party to this appeal.

7

1. *Guiding Principles*

"The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed." (*In re J.D.* (2021) 69 Cal.App.5th 594, 612.)  At this hearing, "the juvenile court has three options:  (1) to terminate parental rights and order adoption as a long-term plan; (2) to appoint a legal guardian for the dependent child; or (3) to order the child be placed in long-term foster care.  [Citation.]  Adoption is the preferred plan and, absent an enumerated exception, the juvenile court is required to select adoption as the permanent plan.  [Citation.]  The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions." (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.)

One of the exceptions to the preference for adoption is the beneficial parent-child relationship exception.  (§ 366.26, subd. (c)(1)(B)(i).)  For this exception to apply, the parent must show by a preponderance of the evidence: (1) regular visitation and contact with the child; (2) the child has a substantial, positive, emotional attachment to the parent; and (3) terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home.  (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).)

The first element, visitation, is "straightforward," requiring that the " 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C., supra*, 11 Cal.5th at p. 632.)  The second element focuses on the child and is determined by taking into consideration factors such as "the age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*In re Autumn H.* (1994)

8

27 Cal.App.4th 567, 576.)  For the third element, "the court must decide whether it would be harmful to the child to sever the relationship and choose adoption.  [Citation.]  Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Caden C.*, at p. 633.)  When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption.  (*Id.* at p. 634.)

When deciding whether terminating parental rights would be detrimental to the child, the court is not comparing the parent's and custodial caregiver's attributes.  (*Caden C., supra*, 11 Cal.5th at p. 634.)  Additionally, a parent's lack of progress in addressing the issues that led to dependency is not determinative.  (*Id.* at p. 637.)  Nonetheless, a parent's inability to address the issues leading to dependency can be relevant in assessing whether the interaction between parent and child "has a ' "negative effect" ' on the child."  (*Ibid.*)  Performing this analysis is a "subtle enterprise."  (*Id.* at p. 634.)  "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home."  (*Ibid.*)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parent-child relationship, for substantial evidence. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.)  "We review its ruling on the third element under a hybrid standard, reviewing its factual determinations concerning the detriment analysis for substantial evidence but its ultimate

weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion." (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1068.) A court abuses its discretion when it makes an arbitrary, capricious, or patently absurd determination. (*Caden C.*, at p. 641.) As a reviewing court, we do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Id.* at p. 640.)

### 2. *Analysis*

The juvenile court found Father established the first prong of the beneficial parent-child relationship exception by maintaining regular visitation and contact with Child. The Agency concedes Father established the first prong, and we agree substantial evidence supports this conclusion.

As to the second prong, Father claims the juvenile court erred in finding the parent-child relationship exception did not apply because the record contained sufficient evidence that Child enjoyed a significant, positive attachment to Father. At this step of the analysis, "courts assess whether 'the child would benefit from continuing the relationship.' " (*Caden C., supra*, 11 Cal.5th at p. 632.) The focus is on the child, and factors considered are " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*)

Child has been in foster care since his discharge from the NICU. When he was discharged from the hospital at almost three months old, Child was too young to have developed a strong emotional attachment to Father or understand the concept of a biological father. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 459, 467 [two-year old child was "very young, too young to understand the concept of a biological parent"].) Then, at the time of the

section 366.26 hearing, Child was 21 months old and had been living with the foster family for all but the first three months of his life and had never lived under Father's custody or care. Child was happy, thriving and receiving appropriate, specialized care while living with the foster family. While Father changed Child's diaper, played with Child, managed Child's feeding tube sessions, and was attentive to him, visits were supervised and dependent on Father's drug treatment schedule. Father clearly loves Child, and Child appeared to enjoy his visits with Father. The Agency consistently reported positive interactions between Father and Child. Child, however, was consistently content and largely did not suffer negative reactions at the end of visits.

Given Child's age, the short time he spent with Father throughout his young life, and the lack of any significant effect on him following visits or when Father missed visits, it is far from clear that Father's interactions rose above pleasant visits with some emotional connection. In sum, substantial evidence supports the juvenile court's determination that Father fell short of establishing the second prong of the beneficial relationship exception.

As to the third prong, Father claims the juvenile court erred by considering Father's inability to maintain his sobriety when it found the benefits of adoption would outweigh the detriment to Child caused by terminating their relationship. Assuming arguendo Father met the second prong, the juvenile court weighed the harm to Child of losing the relationship with Father against the benefits of adoption. (*Caden C., supra*, 11 Cal.5th at p. 640.) It considered how it must "assume that the moment parental rights are terminated, [Father] will not have any relationship whatsoever with [Child]." The court explained it considers "the basis of why dependency was declared" and the "stability provided for [Child]." In doing so, the court

11

considered that it "terminated reunification services because [Father] was unable to maintain his sobriety" and explained "that's a factor to consider." The court concluded that "the stability and the benefits of adoption outweigh any detriment in severing their relationship."

Contrary to Father's assertion, the juvenile court engaged in a comprehensive analysis as to whether Father met the third prong of the exception, as instructed by *Caden C.* (*Caden C., supra*, 11 Cal.5th at pp. 633–634.) While the court considered Father's inability to maintain sobriety, it correctly explained it was only one factor to consider, ultimately concluding that the benefits of adoption outweighed the loss of the relationship with Father. (*Id.* at p. 639 ["a parent's struggles with substance abuse, [. . . ] could be directly relevant to a juvenile court's analysis in deciding whether termination would be detrimental"].)

We conclude both that substantial evidence supports the juvenile court's ruling, and that the juvenile court did not abuse its discretion in finding that terminating the relationship would not be detrimental to Child "when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) The Agency removed Child from Father's custody when he was a newborn, and he spent all his life with a foster family and prospective adoptive parents. Child has ongoing, complex medical needs which his foster family is diligently caring for. His caregivers are committed to providing stability and structure.

Father asserts that the loss of "another adult capable of changing [Child]'s feeding tube" is a specific harm to Child. However, nothing in the record suggests the caregivers were unable to meet Child's feeding needs in Father's absence. For example, in late August 2024, Father was cleared by the public health nurse to handle Child's feeding tube meals, but shortly after

12

that, Father relapsed multiple times and entered treatment for varying periods of time. There is no indication that Child was harmed by Father's unavailability during that time.

Like the juvenile court noted, we have no doubt that Father loves Child, but he points to no evidence that terminating Child's relationship with him would be detrimental to Child; he identified no specific harm Child would suffer from the loss of this relationship; and he offered no theory under which we could conclude that Child's loss of his relationship with Father would outweigh the benefit of stability to Child in a new adoptive home.

In contrast, the record supports the court's determination that Child's current caregivers have provided a safe, stable, secure home for the majority of Child's life; that Child had been thriving, meeting milestones, growing, and developing in their home; and that Child had minimal difficulty transitioning from visits with Father. Viewing the evidence in the light most favorable to the juvenile court's order (*Caden C., supra*, 11 Cal.5th at p. 640), as we must, we conclude the juvenile court did not abuse its discretion in declining to apply the parental-benefit exception to adoption.

B. *Substantial Evidence Supports Court's Finding ICWA Did Not Apply*

Father contends that substantial evidence does not support the juvenile court's finding that ICWA does not apply to Child's case because the Agency did not comply with its duty of initial inquiry regarding his possible Native American ancestry. In particular, he argues the Agency should have inquired of the paternal grandfather and paternal aunts about any possible Native American ancestry.

1. *Guiding Principles*

Congress enacted ICWA to address concerns regarding the separation of Native American children from their tribes through adoption or foster care

13

placement. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) ICWA provides: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe" . . . of the pending proceedings and of their right of intervention." (25 U.S.C. § 1912(a); see also, *Isaiah W.*, at p. 8.) California law also requires such notice. (§ 224.3, subd. (a).) Both ICWA and California law define an "Indian child" as a child who is either a member of a Native American tribe or is eligible for membership in a Native American tribe and is the biological child of a member of a Native American tribe. (25 U.S.C. § 1903(4); § 224.1, subds. (a), (b).)

Sections 224.2 and 224.3 describe California's ICWA inquiry and notice requirements for juvenile dependency cases. Under sections 224.2 and 224.3, the Agency and the juvenile court are generally obligated to: (1) conduct an initial inquiry regarding whether there is a reason to believe the child is, or may be, a Native American child; (2) if there is, then further inquire whether there is a reason to know the child is a Native American child; and (3) if there is, then provide ICWA notice to allow the Native American tribe to make a determination regarding the child's tribal membership. (See *In re D.S.* (2020) 46 Cal.App.5th 1041, 1048–1052 (*D.S.*); *In re Austin J.* (2020) 47 Cal.App.5th 870, 882–885.)

Section 224.2, subdivision (a) imposes on the juvenile court and the Agency "an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . has been filed, is or may be an Indian child." Section 224.2, subdivision (b) establishes the Agency's duty of initial inquiry, providing:

> "If a child is placed into the temporary custody of [the Agency] . . . , [the Agency] . . . has a duty to inquire whether

14

that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."

An "extended family member" under that statute includes a person "who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); §§ 224.1, subd. (c), 224.2, subd. (b).)

When a juvenile court finds that ICWA does not apply to a case, it implicitly finds that neither the Agency nor the court knew, or had reason to know, that the child was a Native American child, and that the Agency fulfilled its duty of inquiry. (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.) On appeal, we review for substantial evidence a juvenile court's finding that ICWA does not apply. (§ 224.2, subd. (i)(2); *In re A.M.* (2020) 47 Cal.App.5th 303, 314.) Our Supreme Court stated that a juvenile court's "fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1141 (*Dezi C.*).) Regarding the applicable standard of review, the court held: "If, upon review, a juvenile court's findings that an inquiry was adequate and proper and ICWA does not apply are found to be supported by sufficient evidence and record documentation as required by California law [citation], there is no error and conditional reversal would not be warranted even if the agency did not inquire of everyone who has an interest in the child." (*Ibid.*)

15

## 2. *Analysis*

Father contends the Agency's initial section 224.2 inquiry was deficient because it failed to ask the paternal grandfather and the paternal aunts about the possibility of Child's Native American ancestry. As Father correctly notes, the Agency's duty to make that initial inquiry applied to, among other persons, "extended family members," which includes Child's paternal grandparents and aunts. (§§ 224.1, subd. (c), 224.2, subd. (b); 25 U.S.C. § 1903(2).)

Based on our review of the record, we conclude, contrary to Father's argument, that there is substantial evidence to support findings by the court that the Agency fulfilled its duty of initial inquiry and that ICWA did not apply to Child's case. First, the record shows that the Agency inquired of Mother, Father, maternal grandmother, maternal aunts, and paternal grandmother about any possible Native American ancestry, and they all denied Native ancestry. Also, the paternal grandmother informed the Agency that there was no Native American ancestry in the family.

Second, there is substantial evidence in the record to support a finding by the court that the Agency fulfilled its duty to contact the paternal grandfather and paternal aunts and inquire regarding Child's possible Native American ancestry. As discussed above, the Agency mailed notification and information forms relating to Child's case to the paternal grandfather and the paternal aunts, but it did not receive a response from anyone. The Agency then attempted to call the paternal grandfather and paternal aunts, but the phone numbers were disconnected. Father twice declined to provide current contact information for the paternal grandfather and paternal aunts. Paternal grandmother also declined to provide contact information for other family members. The court could reasonably find that, given their failure to

16

respond to the Agency's mailings and calls, the Agency had no further duty to make additional attempts to contact them to inquire about any Native American ancestry. In particular, the court could find that the Agency, by mailing the notification and information forms and calling the paternal grandfather and paternal aunts (presumably, to the only addresses or other contact information it had for them), made "a meaningful effort to locate and interview" the paternal grandfather and paternal aunts. (*In re K.R.* (2018) 20 Cal.App.5th 701, 709 (*K.R.*).) "The Agency is not required to 'cast about' for information or pursue unproductive investigative leads." (*D.S., supra*, 46 Cal.App.5th at p. 1053.) The duty of initial inquiry " 'does not require the agency to "find" unknown relatives and others who have an interest in the child, merely to make reasonable inquiries. The operative concept is those people who are reasonably available to help the agency with its investigation into whether the child has any potential Indian ancestry should be asked.' " (*Dezi C., supra*, 16 Cal.5th at p. 1140.) Therefore, the court here could reasonably find that the paternal grandfather and paternal aunts, by not responding to the Agency's mailings and calls, were not reasonably available to help the Agency investigate whether Child was possibly a Native American child. (*Ibid.*)

Accordingly, we conclude that there is substantial evidence to support a finding by the court that the Agency made a meaningful effort to locate and interview those persons who were reasonably available to help it investigate whether Child had any possible Native American ancestry. (*Dezi C., supra*, 16 Cal.5th at p. 1140; *K.R., supra*, 20 Cal.App.5th at p. 709.) Because there is substantial evidence to support the court's findings that the Agency's initial inquiry was adequate and proper and that ICWA does not apply to

17

Child's case, the court did not err by finding that ICWA did not apply to Child's case.  (*Dezi C.,* at p. 1141.)

DISPOSITION

The orders terminating parental rights are affirmed.


RUBIN, J.

WE CONCUR:

O'ROURKE, Acting P. J.

BUCHANAN, J.